Case number 24-1004, Radio Communications Corporation petitioner v. Federal Communications Commission and United States of America. Mr. Welch for the petitioner, Mr. Sorenson for the respondents. Mr. Welch, good morning. Good morning and may it please the court. The ultimate issue for the court to decide in this case is whether the petitioner has the best reading of the Low Power Protection Act. And in our view, the Low Power Protection Act promotes nationwide Class A licensing to protect small community low power TV licenses. On the other hand, paragraph 38 of the order on review surmises that the purpose of the Low Power Protection Act is to promote nationwide Class A license denial to protect National Association of Broadcasters urban-based clients. And that's an end that is achievable without any legislation whatsoever. Historically, the FCC introduced urban broadcast competition through low power licensing about 40 years ago. Before you get to history, let's just talk about the text of the market area with not more than 95,000 households. Your Honor, that's in the statute, obviously. But that's the very end of the substantive part of the statute. That's the operative text. It's operative text, but it's in the statute. That's the only place. It's an eligibility requirement. It's an eligibility requirement, and it's the only place in this act where there's conceivably an argument that the Congress intended to limit eligibility as the FCC construes it. So that very last thing that's in this section is at the bottom of something called considerations for eligibility. What is the designated market area in which your client operates? It's Hartford, New Haven, right? New Haven, yeah. Okay. So a lot more than 95,000 households in that designated market area. Yes, but there's not 95,000 in my client's licensed area. No, but the statute is key to the DMA. I would disagree, Your Honor. How can you disagree? That's what the statute says. Well, I can disagree if we don't jump to the end of the statute. Because we're missing... I'm not meaning to be dismissive of the argument. I'm not following your suggestion that because the critical words in the statute are somewhere down the line in the statute, they're less worthy than if they were further up in the statute. Well, on page one of the statute, Congress defined what a DMA is, and it's not limited by size. It doesn't say that it's protecting urban area licensees. It just says a DMA is what Nielsen says a DMA is, and that's the definition. And what the FCC is doing, and if I may walk through the section of considerations, there are six licensing considerations. Three of them are listed in paragraph 18 of the FCC's order, and those are the conditions under Part I that are not spelled out here. So you have to go to section 336 to see what the three conditions are, and they are operate 18 hours a day. That has nothing to do with limiting anything other than you have to show that. Three hours a week of local programming. Again, that's how is the station operating. You have to have rule compliance with the low-power TV rules. Again, how did the licensee operate? Then in III, demonstrate interference-free operation. While they already exist as a licensee, we can submit a pro forma kind of exhibit to say, see file number whatever. We demonstrated interference protection. That again is a manner of operating condition. Operate within a DMA. My client operates in a DMA. Not all low-power TV stations do. So that's another manner of operating condition. And then when we get to the 95,000, this is where the FCC turns manner of operating conditions into a market qualification condition. Completely different than all the preceding ones. It's how does the client, how does the low-power TV operate? He operates by serving 15,000 people. Who does he operate to serve 15,000 people? That's how we view it. These are all licensing manner of the low-power TV. You know, you started out your presentation with stating that we need to look at the best reading of the statute, as opposed to just going to the plain text of the statute, which indicates operates in a designated market area with not more than 95,000 television households. You would have us put in and instead of with, and then have us essentially reading it in the disjuncted. And so I'm asking you, your argument seems to be tailored to best reading to support your claim, as opposed to us just going to the plain text. Well, if you start with the purpose of the statute being to limit eligibility, as the FCC does on page one of its brief, it doesn't even reference, and I don't know that it's even in the order, what they're protecting. Community of license is not in the statute. It's section 307B, which has licensed every single low-power TV station that exists. There isn't a single broadcast station that is licensed to a DMA. This is a change of a hundred years of history. You don't raise a facial constitutional challenge to the statute? Not on that basis, no. Okay. Our reading of the statute is constitutional. We're using the commission's current licensing scheme to make a nationwide licensing. The commission wants to do, for the first time, non-nationwide licensing. But again, according to your term, community of license, that's in the Communications Act. It's not in the LPPA. Which is amendment to the Communications Act. So we can't ignore language in the statute. And we brought that up with the commission, but we didn't get a response. So I, you know, I was hard-pressed to say, to counter anything on that point, because there's nothing there. What about your hundred-year history? Well, it has nothing to do with it. But it has everything to do with it. That's how the stations operate, on the basis of 307B. Now, perhaps an interesting aspect of this is, the commission says that the statute's clear, plain, straightforward, simple, unambiguous. But then it needs to alter the definition of DMA by adding 95,000 to it. Well, if Congress had wanted 95,000 TV households to be the standard, it would have made it part of the definition. But it didn't. It made it part of how does the licensee operate section of the statute. Now, if I could get to just a quick history of low-power licensing. In the early 1980s, FCC came up with a great idea, low-power TV licensing, because it had found that urban areas, or the table of allotments, had served its purpose. So we need more competition in urban areas. So it came up with low-power TV, and even got rid of a licensing policy that precluded licensing in urban areas. But the FCC, its plan of low-power TV was fundamentally flawed, because it left the low-power TV stations unprotected to being taken over, in effect, by the current urban licensees. And Congress twice—I'm sorry, Aaron. I'm just asking if my colleagues have any questions. I'll give you 30 seconds to wrap up, and we'll give you rebuttal time. Okay, thank you. The FCC failed to protect the stations, and Congress twice told the FCC, protect low-power TV. My client lost the station the first go-round, and now we're in the second go-round, and the commission isn't protecting low-power TV again, in our view. It's just not doing it. It's not serving 98 percent of the country. We understand your position. Thank you. Mr. Sorensen. Good morning. May it please the court, Adam Sorensen for the government. I think the parties agree, and your honors well understand, based on your questioning, that this case really comes down to the plain statutory language. RCC wants its low-power television station located near New Haven, Connecticut, to be eligible for the enhanced privileges of Class A status under the Low Power Protection Act. But as Congress made crystal clear in Section 2C2B of that statute, eligibility is restricted to stations that operate in a designated market area with no more than 95,000 television households. I think that straightforward conclusion resolves this case, and the court really need not reach most of petitioners' other arguments. The best reading of the Low Power Protection Act is that Congress meant what it said. The definition of DMA is clearly laid out in Section 2A2 of the statute. It refers directly to Nielsen Media Research's method of dividing TV markets for an equivalent. The commission here looked at it, decided there was no equivalent. And I don't think the commission is sort of adding any additional language there. The with no more than 95,000 language comes directly from Section 2C2B of the statute and is most naturally read to apply to the immediately preceding language the designated market area term. Just thinking about what the RCC has stated about the amendment to the statute. So how would you read the LPPEA and the Communications Act together? Sure. I don't think that there's any conflict at all with Section 307B. That provision imposes a general obligation on the commission to allocate broadcast facilities, channels, licenses fairly efficiently and equitably among the several states. It doesn't have anything in particular to say about low power television, about designated market areas. And so it's just sort of a general background principle. And I think the more specific requirements of the LPPEA control over that general provision to the extent of any conflict. But again, I don't think there's any conflict here. We have this 95,000 threshold applies without respect to which state the DMA falls within. And so there's really no tension at all there. And then they also made an argument about the commission's failure to respond to its interstate commerce clause comment. Why didn't you respond? And if you had responded, what would you say? Sure. So I don't think the commission is required to respond to every single comment that commenters raise. We addressed most of RCC's obligations. The order mentions RCC some 30 times. With respect to the particular commerce clause issue, the communications commission has been regulating broadcasting for a century now. And I think it's very well established that even local television broadcasting falls within the congressional power over interstate commerce. And if we were to respond to that issue, I think we would say that both on a technological level, the allocation of spectrum is an inherently federal issue because the signal contours of even a remote station can reach beyond state lines and interfere with the operations of signal in other states. Also, it's economic activity which substantially affects interstate commerce. You have national affiliates which sometimes operate these low power stations. And so I don't think there's any question under well-established precedent that this is consistent with Congress's commerce power. And why did the FCC determine that the Class A eligible would not be entitled to the must-carry rights? So I think it's important to understand that must-carry rights are very significant. And this is a long and hard-fought issue between television broadcasters and cable companies. And I think Congress understands that and would not, through complete silence, import these very significant rights to Class A stations without saying anything, either in statutory text or history. Another thing to understand is that Class A status does not transform a low-power station into a full-power station. So with certain exceptions not relevant here, low-power stations don't have must-carry status. And so the status quo that Congress was dealing with when it enacted this statute was that low-power stations, including Class A stations, don't get must-carry rights. And there's really nothing in the statute that would indicate to the Commission that Congress had even considered the issue, let alone taken the very significant step of extending must-carry rights to Class A stations. The Court has no further questions. We ask that the petition be divided. Thank you. Thank you, Your Honor. So the must-carry is an interesting issue. In 2004, Congress adopted an amendment to the Communications Act involving the Satellite Home Viewers Improvement Act. And in that act, they covered must-carry issues for satellites, who can assert must-carry on satellites. And Congress specifically added language to the Communications Act to say, low-power or Class A stations cannot assert must-carry on satellite, and were completely silent about must-carry on the terrestrial landline cable TV system. So I would just say Congress has spoken on the issue twice in the statute itself, the exception has to be in the statute, which it isn't. Especially in the statute, the Commission's inferring it from silence. And then if you look at the 2004 amendment to the Communications Act, Congress specifically said, no must-carry on satellite, but said nothing about on cable TV. Thank you, Counsel. Thank you. The case is submitted.
judges: Katsas; Childs; Edwards